1

2

3                 UNITED STATES DISTRICT COURT

4               NORTHERN DISTRICT OF CALIFORNIA

5

6   ROLANDO CASTELLANOS,              Case No.  17-cv-01307-JD

7              Petitioner,
                                      **ORDER DENYING PETITION FOR**
8       v.                            **WRIT OF HABEAS CORPUS AND**
                                      **DENYING CERTIFICATE OF**
9   SCOTT FRAUENHEIM,                 **APPEALABILITY**

10             Respondent.

11

12          Rolando Castellanos, a pro se state prisoner, has brought a habeas petition pursuant to 28

13   U.S.C. § 2254.  The Court ordered respondent to show cause why the writ should not be granted.

14   Respondent filed an answer and a memorandum of points and authorities in support of it, and

15   lodged exhibits with the Court.  The petition is denied.

16                              **BACKGROUND**

17          A jury found Castellanos guilty of second-degree murder with firearm allegations.  *People*

18   *v. Castellanos*, 2015 WL 7300487, at *1 (Cal. Ct. App. Nov. 19, 2015).  He was sentenced to 40

19   years to life in state prison.  *Id*.  On November 19, 2015, the California Court of Appeal affirmed

20   the conviction.  *Id*. at *1.  On February 17, 2016, the California Supreme Court denied review.

21   Answer, Ex. 10.  Castellanos filed a federal petition in this Court which was stayed so he could

22   exhaust an additional claim.  Docket Nos. 1, 24.  The state courts denied Castellanos' habeas

23   petitions that raised the unexhausted claim.  Answer, Exs. 11-13.

24                         **STATEMENT OF FACTS**

25          The California Court of Appeal summarized the facts as follows:

26          **A.  Prosecution Evidence**

27          In February 2012, appellant lived with his wife and daughter on one
            side of a duplex on A Street in Oakland.  Also living in the unit were
28          appellant's brother Mario Villasenor, Mario's family, and appellant's

*United States District Court*
*Northern District of California*

nephew Luis Villasenor.  Alejandro Diaz lived next door and was friends with appellant, Mario and Luis.  Appellant, who by all accounts worked very hard in his gardening business, had purchased a residence in Concord and a share in some unimproved land in Tehama County.

Just after midnight, on February 19, 2012, Alejandro was sitting in his mother's car outside the duplex when he noticed Mario's black Nissan pickup truck was moving.  Appellant and Mario came out of their unit and shouted that someone was stealing the truck.  The brothers got into Alejandro's car and they all pursued the stolen truck with Alejandro driving.  Appellant was armed with a .22–caliber rifle and Mario was armed with a shotgun.  Alejandro brought the truck to a stop on C Street near 98th Avenue by passing it on the left side and pulling in front of it.  Appellant and Mario got out of the car and Alejandro drove away.  Although Alejandro had a cell phone with him, he did not call the police.

At about 12:14 a.m., Oakland police officers responded to the scene of a shooting near C Street and 98th Avenue and found Hector Ramirez lying in the street with his head near the curb.  Ramirez had four entrance gunshot wounds in his body and was pronounced dead at the scene.  None of the wounds had any gunshot residue on them, meaning they had not been fired from a close enough range to leave traces of burning powder on the body.  Police found one expended shotgun casing and four expended .22–caliber casings on the scene, located between 20 and 50 feet from Ramirez's body.  No weapons were found on Ramirez.

Jesus Sesma lived on 87th Avenue with his wife Guadalupe, his daughter Fransisca, his son-in-law Marco Valenzuela–Quintero, and his grandchildren.  On the night of the shooting, Jesus heard Mario calling to him from outside, asking in a scared tone of voice to be let inside the house.  Jesus looked out and saw Mario and appellant, who were standing next to a Nissan truck.  Mario was wearing pants and a shirt, but appellant was in shorts with no shirt or shoes.  Jesus allowed Mario to pull his truck into the driveway of the house and park behind a gate.  Guadalupe heard Mario say they had just killed someone.

Against Guadalupe's wishes, Jesus allowed appellant and Mario to come inside the house, where they spoke to Jesus and Marco for about 25 minutes.  Most of the talking was done by Mario; appellant did not correct him or indicate he disagreed with what his brother said.  Neither Mario nor appellant mentioned anything about gang members or looked outside the window during the conversation.  They did not appear to have any injuries.  Guadalupe and Fransisca listened to what was said from other rooms in the house.

Mario told Jesus he and appellant had shot a "kid" who had stolen his pickup truck and several other things. A neighbor had given them a ride to look for the stolen truck and had stopped it by blocking its path, after which Mario and appellant had pulled the thief out of the truck (the neighbor was not involved).  Mario said he had "finished off the kid" with a shotgun after appellant had shot him first with a .22.  Mario was laughing and said they had "killed an asshole."  Jesus asked appellant whether this was true and appellant said yes.

Appellant said he thought they had been followed.

During the conversation, appellant acknowledged shooting the person who stole the truck and indicated he was going to his property in Tehama County.  He used Marco's cell phone to make a call and was picked up by his wife and his nephew Luis.  After appellant left the Sesma house, Mario described the shooting to Fransisca and his wife, who had arrived to pick him up.  He said they thought the man was carrying some type of metal object or a "piece," and they didn't know whether it was a firearm or a knife.  According to Mario, they were "gonna fuck him up before he fucked them up."  Mario explained that the man started to run after being pulled from the truck and he (Mario) pushed him.  The man then tried to pull something out and because they did not know what it was they shot him.  FN. 3  Mario admitted he had given the man who stole the truck the "mercy shot."

> FN. 3  Neither Mario nor appellant specifically said they had shot the man in self-defense.

The morning after the shooting, Guadalupe called an Oakland Police Department officer she knew and told him about the visit from Mario and appellant the night before.  The same day, appellant's nephew Luis came to the Sesma home and retrieved two guns: a shotgun from the driver's side of Mario's truck and another "rusty" gun from the back of Jesus's work truck.  Jesus found a .22–caliber piece of ammunition in the bed of his truck a few days later.  About a week after Luis took the guns, appellant's cousin Damaris moved Mario's truck off the Sesma property and was later seen by police in San Leandro with another woman removing a rack from the truck.  Appellant did not return to the duplex where his family lived on A Street, and for three months after the shooting, Luis did not know where he was.  Luis moved with appellant's wife and daughter to the house in Concord, and when he saw appellant again three months later, appellant's facial hair had changed.

An autopsy on Ramirez's body was performed by Thomas Rogers, M.D., a forensic pathologist who determined the cause of death to be multiple shotgun and gunshot wounds.  A total of four wounds were found on Ramirez's body: a small-caliber gunshot wound to the middle of his back near his spine, another small-caliber gunshot wound near the right side of his back, a shotgun wound to the right side of his chest, and a shotgun wound to his left foot.  The shotgun wound to the foot was minor, but the bullet wound in Ramirez's middle back and the shotgun wound to the chest could have been lethal in and of themselves, the chest wound being the most severe. Ramirez might have been able to walk after receiving the foot wound, but the chest wound damaged his soft tissue, muscles, sternum, chest cavity, heart, lungs, esophagus, trachea and vertebral column, and he would have collapsed to the ground if he had been standing when he received it. He might have been able to walk after receiving the wounds to his back.  In addition to the gunshot wounds, Ramirez had scrapes and a bruise on his right arm that were caused within three days of the time of death, and blunt injuries on his knees.  He had methamphetamine in his system, and although this could have made him more aggressive, Dr. Rogers could not say what effect the drug actually had on his behavior.

3

**B. Defense Evidence**

Several of appellant's former gardening clients testified as character witnesses on his behalf. They described appellant as "extremely trustworthy," "very honest" and possessing a "high level of integrity." Appellant testified that his neighborhood in Oakland was a high crime area. He had known several people who had been the victims of shootings and he himself had been robbed at gunpoint in 2010. He purchased property in Tehama County and a house in Concord with the intention of moving from the neighborhood and had bought a .22 rifle for protection.

On the evening of February 18, 2012, appellant and his wife went to bed early and were awakened by appellant's sister-in-law banging on the bedroom door and yelling that they were being robbed. Thinking that robbers were in the house, appellant jumped out of bed, grabbed his rifle, and put in a clip of ammunition. When he ran out of the bedroom, his sister-in-law told him, "No, no . . . [i]t's your brother. He's outside." Wearing only his boxer shorts, appellant ran outside and saw Mario and their neighbor Alejandro getting into a car. Mario told appellant his truck had been stolen and appellant got into the back seat of the car.

They caught up to the truck, which was traveling at about 15 miles per hour. Appellant was very nervous and thought the driver, who turned out to be Ramirez, was looking for someone or waiting for somebody. Alejandro pulled alongside the truck on its left and Mario told Ramirez through the window to give the truck back. Ramirez laughed at them and made signs with his hands "like gang bangers do." Appellant thought Ramirez might be on drugs based on his behavior.

Alejandro pulled his car in front of the truck, blocking its path and forcing it to stop. Mario got out of the car first and by the time appellant got out, he saw Mario holding a shotgun horizontally in front of Ramirez to prevent him from escaping. Ramirez, who was larger than Mario, struggled with him over the gun, causing it to move up and down and point in many different directions. Mario told Ramirez to get down on the ground, and Ramirez told him he (Ramirez) "was not alone, that his friends were about to arrive, and that it was going to be bad for us." Appellant couldn't believe what was happening.

The shotgun went off as Mario and Ramirez struggled and Mario fell to the ground. Appellant thought Mario had been shot and ran to his side and asked if he was all right. Mario said he was okay and got up, holding the shotgun. Ramirez started walking backward at an angle and appellant pointed his rifle at him and told him twice, "Stop, I'm gonna call the police." Ramirez said something rude in response and "moved his hand to his waistline." The man who had robbed appellant in 2010 had made a similar gesture when pulling out a gun, and appellant thought Ramirez was going to take out a gun and shoot him. Appellant raised his rifle and fired, backing away from Ramirez as he did so because he "wanted to get out of there." He did not remember how many shots he fired, but it was more than twice. Ramirez walked toward the other side of the street without giving any

4

1    indication he had been shot.

2    Appellant saw headlights coming in his direction and believed it was
     a car containing Ramirez's gang-member friends.  Appellant got
3    behind the wheel of Mario's truck and told Mario to get in.  Another
     shot went off and Mario jumped in the back of the truck.  As appellant
4    drove away, he saw the car that had been approaching was following
     him.  He drove evasively and got away from the car, then went to the
5    Sesma home at Mario's direction.

6    While at the Sesma home, appellant was in shock and didn't speak.
     When his wife and daughter picked him up, he took them to the
7    property in Tehama County because he feared reprisal by gang
     members associated with Ramirez.  He also told his nephew Luis not
8    to go back to the duplex in Oakland.  Soon after the shooting,
     appellant's wife and daughter moved to their house in Concord and
9    appellant went to Mexico by himself.  He returned to the United States
     a couple of months later and was arrested.

10   After his arrest, appellant was questioned at a police station and
     denied being present at the scene of the shooting or knowing anything
11   about what had happened that night.  He lied because he had never
     had any problems with the law before and had never been interrogated
12   by the police.

13   **C. Jury Instructions, Verdict and Post–Verdict Proceedings**
     The trial court instructed the jury on theories of first degree
14   premeditated murder, second degree murder, voluntary manslaughter
     based on imperfect self-defense, self-defense as a justification for
15   homicide, and aiding and abetting.  (*See generally People v.
     Humphrey* (1996) 13 Cal. 4th 1073, 1082 [discussing difference
16   between perfect and imperfect self-defense in a murder case].)  It also
     gave a special instruction advising the jury that while a citizen may
17   arm himself to effect a citizen's arrest of a person who has committed
     a felony, deadly force may not be used to prevent escape unless the
18   person has committed a violent felony, and it was no defense that
     Ramirez was shot during an arrest for vehicle theft.

19
     The jury returned a verdict convicting appellant of second degree
20   murder and finding true the firearm and great bodily injury
     allegations.  After denying appellant's motion for new trial, the court
21   imposed a prison sentence of 40 years to life: 15 years to life on the
     second degree murder count and a consecutive term of 25 years to life
22   for the firearm enhancement under section 12022.53, subdivision (d).

23   *Castellanos*, 2015 WL 7300487, at *1-4 (footnote omitted).

24                          **STANDARD OF REVIEW**

25        A district court may not grant a petition challenging a state conviction or sentence on the

26   basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

27   of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

28   application of, clearly established Federal law, as determined by the Supreme Court of the United

United States District Court
Northern District of California

1    States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

2    light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first

3    prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*,

4    529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

5    determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

6         A state court decision is "contrary to" Supreme Court authority only if "the state court

7    arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

8    the state court decides a case differently than [the Supreme] Court has on a set of materially

9    indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

10   application of" Supreme Court authority if it correctly identifies the governing legal principle from

11   the Supreme Court's decisions but "unreasonably applies that principle to the facts of the

12   prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply

13   because that court concludes in its independent judgment that the relevant state-court decision

14   applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the

15   application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

16        Under §2254(d)(2), a state court decision "based on a factual determination will not be

17   overturned on factual grounds unless objectively unreasonable in light of the evidence presented in

18   the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d

19   1103, 1107 (9th Cir. 2000).  In conducting its analysis, the federal court must presume the

20   correctness of the state court's factual findings, and the petitioner bears the burden of rebutting

21   that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

22        The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

23   state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

24   1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to

25   consider the petitioner's claims, the Court looks to the last reasoned opinion.  *See Nunnemaker* at

26   801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  In this case the Court

27

28

United States District Court
Northern District of California

looks to the opinion from the California Court of Appeal for claims one, three and four.[1]

As grounds for federal habeas relief, Castellanos alleges that: (1) the trial court violated his right to call a witness and present a defense by failing to order the sheriff to locate the witness; (2) the trial court erred by failing to declare a mistrial and counsel was ineffective; (3) the jury was not properly instructed on the defense of justifiable homicide while making a citizen's arrest which prevented Castellanos from presenting a complete defense; and (4) the trial court abused its discretion in denying an evidentiary hearing regarding a juror's possible concealment of bias during voir dire.

## COMPULSORY PROCESS

Castellanos argues that the trial court violated his right to compulsory process when it denied his requests for a continuance and for an order directing the sheriff to show cause why the sheriff had not served a bench warrant against a defense witness.

### Legal Standard

The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. This right was held applicable to the states through the Fourteenth Amendment:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967). In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling other witnesses who would have testified that the first witness made inculpatory statements on the night of the crime. And in *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986), the Court similarly held that the defendant's right to have a fair opportunity to present a

---

[1] The standard of review for claim two is discussed below.

defense, whether rooted in the Fourteenth Amendment's Due Process Clause or in the Sixth

Amendment's confrontation or compulsory process clauses, is violated by a trial court's exclusion

of competent, reliable evidence bearing on the credibility of a confession when such evidence is

central to the defendant's claim of innocence. *See also Rock v. Arkansas*, 483 U.S. 44, 56-62

(1987) (holding unconstitutional Arkansas per se rule excluding all hypnotically enhanced

testimony). The Ninth Circuit has summarized the rule as "states may not impede a defendant's

right to put on a defense by imposing mechanistic (*Chambers*) or arbitrary (*Washington* and *Rock*)

rules of evidence." *LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998).

The right to compulsory process is not absolute, however. *See Taylor v. Illinois*, 484 U.S.

400, 410 (1988). The Sixth Amendment right to present relevant testimony may, in appropriate

cases, bow to accommodate other legitimate interests in the criminal trial process. *See Rock*, 483

U.S. at 55. The clause, for example, applies only to testimony that is both material and favorable

to the defense. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 873 (1982); *see, e.g.,*

*United States v. Bowman,* 215 F.3d 951, 962-63 (9th Cir. 2000) (no 6th Amendment violation

where exclusion of testimony was not at all critical to the defense; testimony sought would not

have exculpated defendant if believed). The accused's compulsory process rights also may be

limited by the state's legitimate interest in efficient trials. *See United States v. King*, 762 F.2d

232, 235 (2d Cir. 1985) (no compulsory process clause violation when trial court denied motion

for continuance to permit defense witness to testify because defendant made neither timely request

for witness production nor "eleventh hour" request on expedited basis).

### Background

The California Court of Appeal set forth the relevant background for this claim:

> On February 1, 2013, a woman named Victoria Perez was interviewed
> by a defense investigator. She told him that on the night of the
> shooting, she had been visiting a friend who lived on C Street,
> "drinking alcohol and rolling blunts" two or three houses down from
> where the shooting occurred. Perez heard a scuffle followed by
> several gunshots. She looked through an open door and saw a white
> pickup truck, which had been stopped with the engine running in the
> middle of the street, drive away. Two people were inside the
> passenger cabin. Perez described the truck as a late 1980s Toyota,
> with wooden panels that might have been used to haul metal or
> cardboard. The only other moving vehicle was a newer sedan heading

United States District Court
Northern District of California

toward the airport that did not seem to be involved.  Perez thought there had been a drive-by shooting because she had not heard any doors opening.

Voir dire commenced on October 28, 2013, and the presentation of witnesses began on October 30.  The defense case began on November 6, and defense counsel served Perez with a subpoena to appear on November 7.  Perez failed to appear, and at defense counsel's request, the trial court issued a bench warrant to secure her attendance, setting bail at $10,000.  The prosecution completed its rebuttal evidence on November 12, and on November 13, defense counsel requested a continuance so he could secure Perez's attendance, indicating her testimony was important because it would corroborate appellant's testimony that Mario and Ramirez struggled over the shotgun before Ramirez was shot.  Counsel filed a written motion for a continuance on November 14, asking for two or three days, and recounting the efforts of his defense investigator to locate Perez.  Asked how long it would take to secure her appearance, counsel stated he "ha[d] no idea."

The court denied counsel's request for a continuance, noting it had been a week since the bench warrant issued and indicating it did not find Perez's anticipated testimony to be particularly significant.  On December 3, 2013, during jury deliberations, defense counsel moved to reopen the evidence because he had information about where Perez was attending school and hoped to get the sheriff to arrest her there.  Counsel asked the court to instruct the sheriff to go to the school and "bring her in," and the court responded: "I issue a warrant.  I don't direct the sheriff to go out somewhere to find somebody."  On December 4, defense counsel advised the court he had contacted the sheriff's department, which acknowledged receiving the bench warrant but had not made efforts to locate or serve Perez.  Counsel asked the court to stay the proceedings and order the sheriff to show cause as to why Perez had not been arrested.  The court replied that it did not have the authority to do so and denied counsel's requests to reopen the defense case or issue an order to show cause.

*Castellanos*, 2015 WL 7300487, at *10.

**Discussion**

The California Court of Appeal denied this claim:

In the case before us, the trial court issued a subpoena, and, when that did not prove effective, it issued a bench warrant.  Appellant "makes no showing that anything that the court did or refused to do is the cause of the absence of the witness at the trial" (*Brinson*, at p. 258), or that the sheriff's alleged inaction can be imputed to the court.  He cites no case supporting his claim the trial court was required to order the sheriff to show cause as to why the warrant had not been served.  Appellant's right of compulsory process was not violated.

Additionally, any error relating to the failure to procure Perez as a defense witness was harmless beyond a reasonable doubt.

United States District Court
Northern District of California

(*See People v. Gonzales* (1994) 22 Cal. App. 4th 1744, 1759 [applying *Chapman* standard to compulsory process violation].)   According to the statement she gave to the investigator, Perez did not see the shooting itself, but heard a struggle followed by several shots (which she believed to have been fired by the same gun, an opinion not supported by the forensic evidence).   Perez did not see the shooting or the events that preceded it.   While her testimony about a struggle would have been consistent with appellant's version of events, it was also consistent with the prosecution theory that Mario and/or appellant pulled Ramirez from the stolen truck before shooting him.   Perez also advised the investigator that she saw a white pickup truck drive away after the shooting.   Although the defense suggested in the motion for new trial that a jury hearing the evidence might have believed this truck contained Ramirez's gang member friends and thus corroborated appellant's testimony, it seems equally if not more likely that the jury would have believed the truck was Mario's, and that Perez was mistaken about its color.   She said the only other car she saw did not appear to be involved in the shooting, something that would have tended to contradict appellant's testimony about being followed.

*Castellanos*, 2015 WL 7300487, at *11.

Castellanos has failed to show that the state court opinion was an unreasonable application of clearly established federal law.   As noted by the state court, the trial court issued a subpoena and when that failed to produce the witness, the trial court issued a bench warrant.   Castellanos has failed to cite any cases, let alone Supreme Court authority, showing that the trial court erred due to the sheriff's inaction.   The defense case began on November 6, and the subpoena directed the witness to appear on November 7.   When she failed to appear a bench warrant was issued. *Castellanos*, 2015 WL 7300487, at *10.   On November 14, Castellanos requested a two-or three-day continuance to locate the witness, but the trial court denied the request.   *Id*.   Jury deliberations began on November 14, but were interrupted when a juror had a medical emergency on November 20.   Clerk's Transcript ("CT") at 244, 256.   Jury deliberations started over on November 20.   Reporter's Transcript ("RT") at 932-33.   Castellanos did not ask the trial court to order the sheriff to locate the witness until December 3, two weeks after deliberations had restarted.   Even though the trial court denied Castellanos' request for a two-or three-day continuance, he had ample time to locate the witness and could have attempted to do so before deliberations restarted.   Furthermore, in *Taylor*, 484 U.S. at 410, the Supreme Court noted that the defendant's right to compel the presence of a favorable witness requires that, "its effective use be preceded by

United States District Court
Northern District of California

deliberate planning and affirmative conduct."  Castellanos has not shown that he met this standard given his delay in requesting that the trial court order the sheriff to show cause.

Even if the trial court's ruling was an error, which is by no means established here, the state court found that it was harmless.  If a state court finds an error harmless, that determination is reviewed under the deferential AEDPA standard.  This means that relief is not available for the error unless the state court's "*harmlessness determination itself* was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).  In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  And if the federal court determines that the state court's harmless-error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief.  *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace *Brecht*).

Castellanos has failed to demonstrate that the state court's harmless-error holding was objectively unreasonable.  The state court noted that the witness did not see the shooting or the events that preceded it, but heard a struggle followed by several shots.  This testimony would have supported Castellanos' version of events but also the prosecution's argument that the victim was pulled from the truck before being shot.  The state court also correctly noted that the witness' testimony regarding the truck driving away was not vital to Castellanos' defense.  Castellanos has failed to show that the state court's harmlessness determination was objectively unreasonable.

## JURY DELIBERATIONS

Castellanos next argues that a mistrial should have been declared when the jury deadlocked.  Specifically, he claims that the trial court erred by failing to declare a mistrial and instead ordering them to continue deliberating, and that counsel was ineffective for failing to move for a mistrial.  Castellanos presented this claim in a habeas petition to the state courts.  The California Supreme Court denied the petition with citations to *People v. Duvall*, 9 Cal. 4th 464, 474 (1995) [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence] and *In re Swain*, 34 Cal. 2d 300, 304 (1949) [a petition for writ of habeas

11

corpus must allege sufficient facts with particularity].  Answer, Ex. 13.

The citations to *Duvall* and *Swain* indicate that the habeas petition was dismissed with leave to amend to allege sufficient facts.  S*ee Curiel v. Miller*, 830 F.3d 864, 869 (9th Cir. 2016).  Because the petition was not refiled or amended the claim is unexhausted*. Sanchez v. Scribner*, 428 F. Appx. 742, 742-43 (9th Cir. 2011).  The Court exercises its discretion to deny the claim on the merits because it does not raise a colorable federal claim.[2]  *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (holding that unexhausted claim may be denied where "it is perfectly clear that the applicant does not raise even a colorable federal claim"); 28 U.S.C. § 2254(b)(2).

**Legal Standard**

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  Thus, an instruction is unconstitutionally coercive if it denies the defendant the due process right to a trial by a fair and impartial jury.  *DeWeaver v. Runnels*, 556 F.3d 995, 1007 (9th Cir. 2009).  The use of a supplemental jury charge given by the court to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation has long been sanctioned.  *See Allen v. United States*, 164 U.S. 492, 501-02 (1896).

A federal district court's decision to give an *Allen* charge must be upheld "unless it is clear from the record that the charge had an impermissibly coercive effect on the jury." *United States v. Easter*, 66 F.3d 1018, 1023 (9th Cir. 1995).  Prior to AEDPA, the standard was not much different on federal habeas review of a state criminal conviction.  *See Jiminez v. Myers*, 40 F.3d 976, 980 n.3 (9th Cir. 1993); *Locks v. Sumner*, 703 F.2d 403, 406 (9th Cir. 1983).  But after AEDPA, the Ninth Circuit has said that in a habeas case involving a state conviction the questions for the court are (1) whether the applicable state court looked at the totality of the circumstances in determining if the instruction was coercive; and (2) whether that court's determination on the coercion question was reasonable. *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011); *DeWeaver*, 556 F.3d at 1007 (state appellate court's holding that supplemental jury instruction containing a hypothetical

---

[2] The Court previously stayed this case to exhaust the claim in state court.  Castellanos has not sought a second stay to again attempt to exhaust this claim.

United States District Court
Northern District of California

mildly slanted in favor of the prosecution was not coercive was not contrary to *Lowenfield*).

Federal courts reviewing an *Allen* charge given by a state court must consider the supplemental instruction "'in its context and under all circumstances,'" *Lowenfield*, 484 U.S. at 237 (citation omitted); *see Jiminez*, 40 F.3d at 980; *Locks*, 703 F.2d at 406-07. Whether the comments and conduct of the state trial judge violated due process ultimately turns on whether "'the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision.'" *Jiminez*, 40 F.3d at 979 (quoting *Locks*, 703 F.2d at 406).

The Sixth Amendment guarantees effective assistance of counsel to defendants in criminal cases. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for a claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be said to have produced a just result. *Id*.

To prevail on a Sixth Amendment ineffectiveness claim, petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient in that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

**Background**

Jury deliberations began on November 14, 2013. CT at 244. On November 20, 2013, deliberations were interrupted when a juror had a medical emergency. *Id*. at 256. That juror was excused, and an alternate juror was substituted in at which point deliberations restarted anew and the prior deliberations were disregarded. *Id*.; RT at 932-33. At the end of the day the jury requested that certain testimony be read back to them. CT at 256-57.

The next morning, Thursday, November 21, 2013, the trial court asked the jury to choose from three options for future deliberations in light of the upcoming Thanksgiving holiday and the trial judge's planned vacation. Answer, Ex. 4 at 1-3. The jury was provided the options of (1)

13

returning the following day, Friday, to deliberate, *id*. at 2; (2) returning the following Monday and

Tuesday, when a different judge would preside, with no deliberations the remainder of that week

due to the Thanksgiving holiday,  *id*. at 2-3; or (3) returning the week after the holidays, on

Monday, December 2, 2013.  *Id*. at 3.  The jury was told to discuss these three options if no verdict

was reached that day and to inform the trial court of the scheduling decision.  *Id*. at 1-2.  The

requested testimony was then read to the jury.  *Id*. at 1.

A few hours later the jury foreperson informed the trial court that the jury believed it

would be unable to reach a verdict.  RT at 934.  In front of the entire jury, the trial court noted that

jury deliberations had restarted with the new juror the previous afternoon and that the morning had

been taken up with certain trial testimony being reread to them.  RT at  935.  The trial court stated,

"while I can appreciate that you feel you've reached a point where you're not moving forward, I

guess to put it bluntly, you haven't been deliberating that long.  And so my inclination is to say

keep working at it.  *Id*.  The trial court then stated:

> I think, in fact, when it's the end of the day and potentially the end of
> the week or late in the day and late in the week, my experience has
> been that if jurors go home and sleep on it and have a chance to just
> reflect on the discussions that have taken place, think about their own
> positions and think about the things that other jurors have said,
> a lot of times when they come back, they're refreshed, they've had a
> chance to reflect individually, perhaps think of some things that
> maybe need to be discussed among the group, and the discussions that
> take place when they resume are often very productive.  They don't
> necessarily lead to a verdict, but oftentimes they can.  It's just very
> helpful, in my experience, and that's why I'm not jumping at the
> opportunity to say, okay, you're hung, because I think you really do
> need to work at it a little bit more.  I just want to explain that to you.
> I'm not being stubborn without a reason, and I'm doing it based on
> large part on experience. So, I don't want to let you off the hook that
> easy.

RT at 935-36.  The jury foreperson responded, "It's understandable.  Technically, it's only one

day of talking."  *Id*. 936.  It was also agreed that the jury would return to deliberate the week after

Thanksgiving on Tuesday, December 3, because a juror had a job interview on Monday,

December 2.  *Id*. at 937; Answer, Ex. 4 at 3.  The jury resumed deliberation on the morning of

December 3, 2013, and reached a verdict on the afternoon of December 4.  CT at 262, 270.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

**Discussion - Juror Coercion**

To the extent Castellanos alleges a claim of state law error based on the trial court's failure to declare a mistrial, he is not entitled to habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").  He has also failed to present a colorable federal claim that the trial court erred by failing to declare a mistrial when the jury was deadlocked after only one day of deliberations.  Only two Supreme Court cases have applied *Allen*'s prohibition on a coercive supplemental charge, *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Early v. Packer*, 537 U.S. 3 (2002).

In *Lowenfield*, after a day and a half of deliberations, the jury indicated that it was unable to reach a decision on a sentencing recommendation in a capital trial.  484 U.S. at 234  The court polled the jury twice as to whether further deliberations would help.  *Id*.  All but one juror responded that further deliberations would be helpful.  *Id*. at 234-35.  The court then reinstructed the jury that if it was unable to unanimously agree on a sentencing recommendation the court would impose a sentence of life without parole and that the jurors had a duty to consult with one another and consider each other's views.  *Id*. at 235.  The jury resumed its deliberations and, thirty minutes later, returned a verdict sentencing the petitioner to death on all three counts of first-degree murder  *Id*.  The Supreme Court considered the supplemental charge and held that, on these particular facts, the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny any constitutional right.  *Id.* at 241.

In *Early*, a California jury struggled to reach a verdict on a count of second-degree murder and one count of attempted murder.  537 U.S. at 4.  After twenty-eight hours of deliberation a juror sent a note, requesting to be dismissed and stating that the seriousness of the charges was causing her to feel burnt out.  After the judge requested that she "hold out just a little bit longer," she agreed to continue.  Later, the foreman sent the judge a note stating that they were no longer able to deliberate because the juror who sent the note did not appear capable of understanding the rules or of reasoning.  The judge informed the jurors that a juror has "a right to disagree with everybody else.  But they do not have a right to not deliberate."  *Id*. at 5  Later, in response to the

judge's questioning, the foreman indicated that the last vote count had been 11 to 1 and that further deliberations would be helpful.  The judge then gave general instructions on the jury's role in determining facts.  *Id*. at 5-6.  Soon after deliberations resumed, the juror again asked to be dismissed but the judge established the juror was continuing to deliberate.  The jury resumed its deliberations and, approximately two days later, returned a guilty verdict on the attempted-murder count and, the next day, a guilty verdict on the second-degree murder charge.  *Id*. at 6.  The state courts and the federal district court denied habeas relief, but the Ninth Circuit reversed.  *Id*. at 7.  The Supreme Court reversed the Ninth Circuit, finding that the Ninth Circuit erred in finding that the state court's denial of the claim was contrary to clearly established Federal law, as established by the Supreme Court.  *Id*. at 10-11.

In light of the Supreme Court not finding any coercion in *Lowenfield* and *Early*, Castellanos has failed to present a colorable claim in this case where the trial court's interactions with the jury after deliberations began and any possible coercion were much less than that of the two Supreme Court cases.  To the extent that Castellanos argues that the trial court erred by not giving a more traditional *Allen* charge, he is still not entitled to relief.   The Supreme Court has held that failing to give a traditional *Allen* charge is less likely to coerce a verdict.  *Lowenfield* at 237-38.

Nor has Castellanos presented a colorable claim under Ninth Circuit precedent.  The trial court did not engage in conduct with a coercive effect.  *See DeWeaver*, 556 F.3d at 1007-08 (finding that supplemental jury instruction containing a hypothetical mildly slanted in favor of the prosecution was not coercive).  The trial court did not poll the jury to determine the jurors' views or the number of jurors in the minority.  *See Parker*, 665 F.3d at 1145, 1148 (explaining that eliciting the jurors' views on the merits could indicate coercion).  The trial court also did not endorse a particular outcome or recast the evidence to specifically address holdout jurors' concerns.  *See Parker* at 1149 (explaining the coercive effect of a trial judge's decision to revisit select pieces of evidence to respond to juror concerns); *Smith v. Curry*, 580 F.3d 1071, 1082-83 (9th Cir. 2009) (finding that the trial court's biased summary of the evidence was coercive).  Nor was there a short time period between the trial court instructing the jury to continue deliberating

and the jury's verdict.  The jury reached a verdict about a day and half after the judge's instruction which was a little longer than the original deliberation time.  To the extent it could be argued that this was a short period it is far from dispositive.  *United States v. Della Porta*, 653 F.3d 1043, 1051 (9th Cir. 2011).  Castellanos has failed to present a colorable claim.

### Ineffective Assistance of Counsel

Nor has Castellanos shown that trial counsel was deficient for failing to seek a mistrial after only one day of deliberations, when the trial court and the foreperson agreed that the new jury had only just begun deliberating.  "[T]he failure to take a futile action can never be deficient performance."  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Nor has Castellanos shown prejudice because it does not appear that the motion would have been granted based on the short amount of deliberations.

Trial counsel was also not ineffective for failing to object when the trial court extended deliberations giving the jury the week of Thanksgiving off.  While this claim of failing to object was brought in state habeas petition, on direct appeal Castellanos argued that the break in jury deliberations violated his due process rights.  *Castellanos*, 2015 WL 7300487, at *11.  The California Court of Appeal denied this claim and quoted from a California Supreme Court case:

> Tactically, there would be no reason why a defendant would necessarily want to force the jury to continue to deliberate without ceasing, against a Christmas holiday deadline; this could lead to a very quick and unfavorable verdict, if the jurors had travel plans or other obligations for the holidays.

*Castellanos*, 2015 WL 7300487, at *12 (quoting *People v. Johnson*, 19 Cal. App. 4th 778, 791 (1993)).

Castellanos has failed to show that trial counsel was deficient for failing to object to the extended deliberations or that he was prejudiced by the failure to object, because the objection would have been overruled and there is no indication that the verdict would have been more favorable to him if the jury had been ordered to deliberate over Thanksgiving week.  These unexhausted allegations fail to raise a colorable federal claim and are denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY INSTRUCTIONS

Castellanos contends that the trial court erred by refusing to give jury instructions that the shooting was justified if he fatally shot the victim while effectuating a lawful citizen's arrest for a violent felony.

**Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71-72. *See, e.g., Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not an element of crime for jury determination, is not open to challenge on federal habeas review). A state trial court's refusal to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id*.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence).

Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616,

624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson* at 156).

**Background**

The California Court of Appeal set forth the relevant background for this claim:

> Appellant proposed two special jury instructions regarding the legality of carrying a firearm during a citizen's arrest and the use of force to arrest a felon.  First: "A private person is permitted to arrest a suspected felon when a felony has in fact been committed or is being committed and the person has reasonable cause for believing the person arrested is the person who committed it.  The right to arrest includes the right to exercise reasonable force as necessary to accomplish it."  Second: "A private person is permitted by law to have a loaded firearm present during the lawful apprehension of a suspected felon."

> The trial court rejected the instructions proposed by the defense and indicated it would instead instruct the jury as follows: "A private citizen may arm himself and lawfully arrest another person who has committed a felony, and may use reasonable force to prevent the arrestee's escape while doing so.  However, deadly force may be used to prevent escape only if the person being arrested has committed a violent felony.  Theft of a motor vehicle is a felony, but it is not a violent felony.  Therefore, it is not a defense in this case that Hector Ramirez was killed while trying to arrest him for theft of a motor vehicle."

> Defense counsel objected to the court's special instruction on the use of force during a citizen's arrest on the ground it did not advise the jury that deadly force was appropriate if Ramirez posed a threat of serious physical harm to appellant or others. The court disagreed: "[W]hat I'm really telling them here is, this is a defense that under some circumstances may be available, but it's not in this case.  The purpose of this paragraph, by the way, is really to assure the jury or reassure the jury, in a sense, that if you believe the defendant's testimony as to what it was that he was doing or intending to do when he got in the car with Mario and Alejandro, he was doing something lawful.  It's lawful for a person to arrest for a felony, auto theft being a felony, and it's lawful to be armed to do that.  So, it's basically my way of telling the jury, don't hold that against the defendant because that's as far as it goes, it's not unlawful. [¶] . . . [¶] But then I go into telling them that self-defense is a defense, and that they must find the defendant not guilty if they found that it was done in self-defense."  The court instructed the jury as indicated.

*Castellanos*, 2015 WL 7300487, at *5.

**Discussion**

The California Court of Appeal set forth the relevant state law regarding a citizen's arrest and reasonable force and denied this claim:

> The special instruction given by the trial court was a correct statement of law. Motor vehicle theft (whether a violation of section 487, subdivision (d)(1) or Vehicle Code section 10851, subdivision (a)) is not a crime that inherently poses a threat of death or great bodily injury, and would not itself justify the use of deadly force during a citizen's arrest. (*See Piorkowski*, supra, 41 Cal.App.3d at p. 329 [deadly force not justified to apprehend fleeing suspects who had stolen wallet from purse in dry cleaning establishment].) Appellant's proposed instruction on reasonable force during a citizen's arrest was incomplete and misleading under the facts of this case, because it would not have advised the jury that deadly force was reasonable only if the underlying felony for which the arrest was made was violent in nature.
>
> Appellant does not suggest he was entitled to use deadly force to make an arrest for vehicle theft, but argues the court's instruction was not appropriate because the evidence supported a finding Ramirez additionally committed violent felonies that did threaten death or great bodily injury—assault with a deadly weapon or firearm, robbery and carjacking. In support of this assertion, appellant relies on his own testimony regarding the pursuit of the truck, Ramirez's struggle with Mario over the shotgun, and the shooting itself. He reasons that in attempting to wrest the gun away from Mario, Ramirez committed an assault with a deadly weapon and used force to effectuate the taking of the truck, transforming the theft into a carjacking and/or robbery. Moreover, in light of his testimony that Ramirez had thrown gang signs and had told Mario his friends were coming, appellant argues he had reason to believe Ramirez posed a threat of death or great bodily injury to himself or others. We are not persuaded.
>
> First, substantial evidence did not support the conclusion Ramirez committed any of the three violent felonies posited by appellant. An assault requires the present ability to commit a violent injury on another person (*People v. Licas* (2007) 41 Cal. 4th 362, 364), and there was no evidence Ramirez ever gained control over the shotgun during his struggle with Mario. (*Contrast People v. Hanson* (1934) 220 Cal. 589, 590 [defendant who struggled with police officer over police officer's gun, causing it to discharge and hit police officer in the hand, supported conviction for assault with a deadly weapon]; *People v. McCoy* (1960) 181 Cal. App. 2d 284, 286–287 [conviction for assault with intent to commit murder upheld where defendant grabbed officer's gun and gained control over it but third party intervened].) And, while the use of force may transform a theft into robbery or carjacking where the force is used to escape with the property (*People v.*

20

United States District Court
Northern District of California

*Webster* (1991) 54 Cal. 3d 411, 441; *People v. O'Neil* (1997) 56 Cal. App. 4th 1126, 1131), the evidence does not support an inference that Ramirez was attempting to escape with the stolen truck when the struggle ensued.

Second, even if we assume appellant's description of events would support the inference Ramirez committed a violent felony during his struggle with Mario (as opposed to simply trying to escape on foot), appellant did not testify that he was attempting to arrest Ramirez for a violent felony when he shot him. Rather, appellant testified that after the struggle had ended he told Ramirez to stop "[b]ecause I wanted him to stop, I wanted to call the police. He had stolen the truck." It was only after Ramirez made a gesture toward his waistline that appellant fired his rifle, claiming he did so because he believed Ramirez was going to pull out a gun and shoot him.

Third, any argument that appellant was entitled to use deadly force because Ramirez posed a risk of death or serious bodily harm to others was encompassed in the jury instructions on self-defense and imperfect self-defense. Appellant suggests these instructions did not adequately cover the theory of deadly force used to effectuate a felony arrest because both self-defense and imperfect self-defense require a perception of "imminent" danger, whereas there is no comparable requirement for the force used during a citizen's arrest. Assuming appellant is correct about the law on this point, the only evidence that appellant shot Ramirez because he posed a risk of death or great bodily harm arises from appellant's own testimony that he thought Ramirez was in the process of pulling out a gun to shoot him. Under the facts of this case, the instructions on self-defense adequately covered any theory that appellant acted because he believed Ramirez posed a risk of death or serious bodily injury. (*See People v. Dieguez* (2001) 89 Cal. App. 4th 266, 278–280 (*Dieguez*) [no instructional error when legal principle at issue covered in other instructions].)

Finally, any error in failing to instruct on the use of deadly force during a citizen's arrest was harmless. The California Supreme Court has not yet determined which standard of prejudice applies to the erroneous failure to instruct on an affirmative defense. (*People v. Salas* (2006) 37 Cal. 4th 967, 984.) But whether we apply the "miscarriage of justice" standard for state law error under *People v. Watson* (1956) 46 Cal. 2d 818, 836 (*Watson*), or the more stringent harmless-beyond-a-reasonable doubt standard for federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24 (Chapman), a failure to instruct will be deemed harmless when the question posed by the omitted instruction was resolved under other instructions. (*See People v. Watt* (2014) 229 Cal.App.4th 1215, 1220; *Dieguez, supra,* 89 Cal. App. 4th at pp. 278–280.) In rendering a verdict of second degree murder despite the instructions on self-defense and imperfect self-defense, the jury necessarily rejected the theory that appellant reasonably believed Ramirez posed a risk of death or great

bodily harm.

*Castellanos*, 2015 WL 7300487, at *6-8 (footnotes omitted).

The California Court of Appeal's conclusion was not contrary to, or an unreasonable application of, Supreme Court authority. The state court's finding that the special instruction was correct under state law is binding on this Court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Menendez*, 422 F.3d at 1029 ("Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief.").

Nor has Castellanos shown any error with the jury instructions or omission of instructions that would provide for federal relief. Even if the victim had committed a violent felony that could warrant the amount of force used, the state court correctly noted that there was insufficient evidence that Castellanos was attempting to arrest the victim when he shot him. The state court also found that other jury instructions, such as the self-defense instruction, adequately addressed the defense theory.

Even if there was an instruction error, which was not established here, the state court found that it was harmless. As set forth above, if a state court finds an error harmless, relief is not available for the error unless the state court's "*harmlessness determination itself* was unreasonable." *Davis*, 135 S. Ct. at 2199 (2015) (quoting *Fry*, 551 U.S. at 119). The state court found that by finding Castellanos guilty of second-degree murder despite instructions of self-defense and imperfect self-defense, the jury rejected the theory that Castellanos reasonably believed that the victim posed a risk of death to him. He has failed to demonstrate that the state court's harmless-error holding was objectively unreasonable.

## JUROR BIAS

Castellanos alleges that the trial court erred by failing to hold an evidentiary hearing when a juror made posttrial statements to an investigator suggesting that she was untruthful when she stated in a written juror questionnaire that she was not biased against Hispanics.

United States District Court
Northern District of California

**Legal Standard**

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted).  However, clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties.  *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003); *see*, *e.g.*, *Estrada v. Scribner*, 512 F.3d 1227, 1241 (9th Cir. 2008) (district court did not abuse its discretion in declining to hold hearing on juror bias where state court's determination was not unreasonable in finding two jurors were not actually biased, and that juror bias could not be presumed based on jurors' honesty during voir dire); *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing sua sponte whenever presented with evidence of juror bias).

The two most relevant Supreme Court cases -- *Remmer v United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982) -- do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.[3]  *Smith* states that this "may" be the proper course, and that a hearing "is sufficient" to satisfy due process.  *Tracey*, 341 F.3d at 1044 (citing *Smith*, 455 U.S. at 217, 218).  *Smith* leaves open the door as to whether a hearing is always required and what else may be "sufficient" to alleviate any due process concerns.  *Id*.; *see*, *e.g.*, *Davis v. Woodford*, 384 F.3d 628, 652-53 (9th Cir. 2004) (upholding state trial court's implicit rejection of juror bias claim, where

---

[3] On March 6, 2017, the Supreme Court decided *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), reversing and remanding a jury conviction where two jurors submitted affidavits post-verdict showing that a third juror deployed "a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed" and "encouraged other jurors to join him in convicting on that basis."  *Id*. at 862, 870.  The Court stated that for an inquiry to proceed, "the statement must tend to show that racial animus was a significant factor in the juror's vote to convict."  *Id*. at 869.  The California Supreme Court and California Court of Appeal denied Castellanos' appeals more than a year before *Pena-Rodriguez* was decided; therefore, it cannot be the basis for federal habeas relief.  *See Greene v. Fisher*, 565 U.S. 34, 38 (2011).  Even so, as discussed below, there is no evidence that the juror in this case demonstrated any racial bias during deliberations.

United States District Court
Northern District of California

United States District Court
Northern District of California

juror submitted note to judge before deliberations expressing skepticism about whether defendant would remain in prison if jury returned a noncapital sentence, and judge provided a detailed instruction that jurors should presume that state officials would properly perform their duties when executing the sentence but did not conduct an investigation); *Tracey*, 341 F.3d at 1044-45 (concluding that state trial court's decision not to question juror further to obtain names of other jurors to take additional testimony from them was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent).

**Background**

The California Court of Appeal set forth the relevant background for this claim:

> In support of his claim of juror misconduct, appellant submitted a declaration from his defense investigator regarding a posttrial interview of Juror No. 4.  According to the declaration, Juror No. 4 was asked by the investigator whether she would have had a different view of the case if an independent witness had testified to the facts recounted by Victoria Perez.  Juror No. 4 initially said yes, but when presented with a declaration along those lines refused to sign it and stated: "I am just through with this.  I don't want to sign anything.  I don't want to be involved anymore.  I served my jury duty.  Beside[s], he is just a Mexican and he and his brother got what they deserved.  He is just an illegal who was trying to get something."  When answering a pretrial written questionnaire, Juror No. 4 had left blank a response to a question asking her to identify any racial or ethnic group about which she had negative feelings, and had answered no to a question asking whether the fact appellant was of Mexican heritage would make her feel more or less inclined to convict him of a crime.

> At the hearing on the motion for new trial, defense counsel argued Juror No. 4's posttrial statements to the investigator suggested she had been untruthful when she answered her questionnaire and effectively denied any bias against Hispanics.  The prosecutor urged the court to reject this claim, noting, "[Ninety] percent of the people in this courtroom, throughout the course of this trial, were actually Mexican, including the victim in this case, the prosecutor, most of the civilian witnesses, so I don't really see how that would have impacted any outcome."

> The court denied defense counsel's request for an evidentiary hearing on the issue of juror misconduct and denied the motion for new trial.  "First of all, . . . the heritage of [appellant] and his brother, . . .  I'm not considering that as reflective of her thought process during the decision making process in any way.  I think the law prohibits that.  [¶] So, the only way in which I could determine that it might be—it's potential juror misconduct is if it tends to be indicative of her having lied in the juror questionnaire.  And I do not consider it to be such.  Number one, she's obviously—what she said is something she said in apparent frustration with the investigator's efforts to get her to sign a

declaration and her desire not to do that, not to have anything to do with this and be done with the whole thing.  And, frankly, it appears she was not in a very good mood at the time she said that.  Comments made at that point well after the trial, under circumstances where she apparently just basically feels bothered by this whole thing, this inquiry, I don't consider to be in any way evidence of what her attitude was at the time she completed a questionnaire or really necessarily that that's what her attitude was at the time she was reaching a verdict in this case."

The court continued: "What it really tells me is, she was really bugged with this investigator, and if she did really have this attitude at that moment in time, it doesn't mean she had that attitude when she was completing that questionnaire, and I don't think it would be appropriate for me to conduct—start a whole inquiry and issue an order for her to appear in court and answer questions about that based on these comments, and so I'm denying that request for a hearing, based on this showing. [¶] And you gotta realize that I am not considering this as evidence of what thought—of what her thought process may have been or her attitudes may have been at the time she was reaching a verdict, because it's absolutely inadmissible for that purpose.  I can only consider it as—on the question of whether this is somehow evidence of her being dishonest at the time she completed the questionnaire, and to me it doesn't have any bearing on that.  It doesn't tend to reveal anything on that one way or another."

*Castellanos*, 2015 WL 7300487, at *13-14 (footnote omitted).

**Discussion**

The California Court of Appeal set forth the relevant state law and denied this claim:

The trial court did not abuse its discretion in denying defense counsel's request for an evidentiary hearing to determine whether Juror No. 4 had committed misconduct.  Although the only evidence of the purported misconduct was the hearsay declaration of the defense investigator, the court assumed the statements by Juror No. 4 had been made.  There was, therefore, no material conflict of fact requiring a hearing. (*Hedgecock*, *supra*, 51 Cal. 3d at p. 419.)

Nor did the court err in concluding appellant had failed to establish a strong possibility that prejudicial misconduct occurred.  The court reasonably concluded that in context, Juror No. 4's statements were borne of frustration with the posttrial investigation and did not tend to show her state of mind when she answered the written questionnaire during voir dire.  Moreover, the statements cited as proof of misconduct were made after the verdicts were entered, long after Juror No. 4 filled out the written questionnaire.  And, as the trial court noted, the statements were inadmissible to show her mental process during deliberations themselves. (Evid.Code, § 1150, subd. (a).)  In any event, no evidence was presented to suggest Juror No. 4 shared the expressed sentiments with other jurors or with anyone other than the defense investigator at a moment of frustration.

> Appellant cites federal cases holding that statements by jurors evincing their own racial prejudice are not inadmissible to prove jury bias under the rule that the mental processes of jurors may not be admitted to impeach a verdict. (*Williams v. Price* (3d Cir. 2003) 343 F.3d 223, 227–233; *United States v. Henley* (9th Cir. 2001) 238 F.3d 1111, 1121.) Here, the trial court did not decline to consider evidence of Juror No. 4's statement to the investigator on the ground it was inadmissible; rather, the court made the factual finding that given the context of the statement (a posttrial interview in which the juror was irritated with the defense investigator and did not wish to submit a declaration), the defense had not carried its burden of demonstrating Juror No. 4 was untruthful during voir dire.

*Castellanos*, 2015 WL 7300487, at *15.

Because there is no clearly established Supreme Court authority requiring a state or federal court to hold a hearing every time a claim of juror bias is raised, the state court's decision cannot be considered an unreasonable application of clearly established federal law.  Moreover, in this case there was a hearing before the trial court with respect to the motion for a new trial, just not the additional evidentiary hearing Castellanos had requested.  As recounted above, the trial court at the hearing reviewed and considered the evidence, including the verbal statement made by the juror as recounted by the defense investigator.  The trial court found that the statements had been made well after trial, and, even assuming the statements had been made, they seemed more focused on the juror's frustration with the defense investigator.  The trial court did not consider the statements to be evidence of what the juror's attitude had been when she filled out the jury questionnaire or reached the verdict in the case.  The California Court of Appeal found no abuse of discretion and noted that no evidence was presented to suggest that the juror shared the expressed sentiments with other jurors or with anyone other than the defense investigator at a moment of frustration.

Respondent notes the similarities of this case to *Estrada v. Scribner*, 512 F.3d 1241 (9th Cir. 2008).  In *Estrada*, the evidence of juror bias arose after the jury verdict and was based on a defense investigator's declaration regarding a juror's refusal to sign a declaration prepared by the investigator.  *Id*. at 1233-34.  During the hearing on the motion for a new trial in *Estrada*, the petitioner sought to call the juror as a witness.  *Id*. at 1234.  The trial court denied the request to

call the juror as a witness and denied the motion for a new trial.  *Id.*  The trial court found that the juror was not dishonest on voir dire based on the defense investigator's declaration and that the juror did not need to be called to testify.  *Id.* at 1234, 1240.  In affirming the denial of the habeas petition in *Estrada*, the Ninth Circuit noted that the trial court held a hearing and without calling the juror to testify, found that the juror was not biased, and that factual determination was not unreasonable.  *Id.* at 1240.

Similarly, in this case the trial court reviewed the evidence of the juror's statement in a hearing and concluded it was the result of frustration with the investigator and did not demonstrate that the juror was biased or dishonest when answering written voir dire questions months earlier.  The California Court of Appeal made the same findings.  This Court must presume the correctness of the state court's factual findings.  *See* 28 U.S.C. § 2254(e)(1); *see also Skilling v. United States*, 561 U.S. 358, 396 (2010) (in reviewing claims of juror bias, the deference due to trial court is "at its pinnacle").

### CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge may grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  The

clerk shall substitute Rick Hill as respondent because petitioner is now incarcerated at Folsom State Prison.

**IT IS SO ORDERED.**

Dated: May 18, 2020

_____
JAMES DONATO
United States District Judge